IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cause No. CR-11-96-BLG-RFC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| JOSHUA CHARLES SWAN | ) | |
| MICHAEL AARON STUKER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Defendants have been indicted for allegedly tampering with a witness, in violation of 18 U.S.C. § 1512(a)(2)(A) and 2, and possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) and 2. It is alleged that on July 1, 2011, the Defendants used or attempted to use physical force against R.B. by arming themselves and pointing a firearm at R.B. in order to influence, delay, or prevent his testimony at the trial in *United States v. Joseph Lira*, CR-10-135-BLG-RFC. The Lira trial took place on July 25, 2011.

Defendant Stuker filed a motion to suppress all evidence and testimony of the juvenile who allegedly witnessed the crime. Defendant Swan joined in the

motion. The government opposes Defendants' motions. A hearing on this matter was held on January 31, 2012.

## BACKGROUND

On or about July 1, 2011, R.B. was opening the front door to his residence located in Billings when he observed Defendants Swan and Stuker on his front patio. Stuker pulled a black revolver out of his waistband, pointed it at R.B. and said, "I hope you don't plan on doing anything with Joe." Swan was also pulling up his shirt and R.B. saw the black handle of a handgun in Swan's waistband. R.B. reportedly took the statement from Stuker as a threat instructing him not to testify against Joe Lira. R.B. told Stuker to get off his porch and slammed the door. R.B.'s 11-year-old son, L.W., witnessed the altercation.

FBI Task Force Officers Jamie Schillinger and Troy Charbonneau interviewed L.W. on July 22, 2011 in their vehicle. At the time of the interview, L.W. was accompanied by his mother and agents were in the process of moving the family to a motel for their safety. R.B. was not present at the time of the interview. The agents asked L.W. if he recalled a day where someone arrived at the apartment and had a disagreement with R.B. L.W. advised he did and he recalled three people at the residence. Two were at the door. He could not see the

third person, but he knew someone else was standing outside because he could hear them moving on the staircase.

L.W. said the two males had guns and he had never seen them before. L.W. later recalled that he had seen the two individuals before after his mother reminded him of an earlier incident. L.W. also testified at the suppression hearing that he had seen the two individuals before.

When R.B. answered the door, L.W. said he stood behind R.B. and saw the two men through the crack in the door. L.W. told law enforcement he saw one of the males standing back from the door, with a short barrel black and gray gun in his waist. He said this male did not speak. The other one also had a gun in his hand, and "told Joey not to do something to some guy." L.W. did not remember the specific name. L.W. testfied he was scared for R.B.'s safety. The males left after R.B. shut the door.

The agents asked the boy if he believed he could identify the men he saw that day. He said he believed he could and Agent Schillinger showed him three booking photographs on his Blackberry telephone. No other photographs were shown.

Agent Schillinger specifically testified at the suppression hearing that he gave L.W. the admonition he usually gives when showing someone photos for

identification purposes. Specifically, Schillinger told L.W. that the photos may or may not be suspects and that he would be asked whether or not he recognized the person or persons; although L.W. testified he did not remember the admonition. The photographs were Joshua Swan, Anjel Aguilar, and Michael Stuker. Agents testified at the suppression hearing that L.W. was not shown a six-person photo line-up because the agents were attempting to stop other threats and protect witnesses and there was not sufficient time to arrange a six-person photo line-up.

L.W. was confident about his identification of the individuals in the photographs even though he did not know the names of the individuals. When shown the photograph of Swan, L.W. stated he was the person at the doorway who did not say anything but had the gun in his waistband. When shown the picture of Anjel Aguilar L.W. said he did not recognize him. When shown the photograph of Stuker, L.W. identified him as being the one at the door with the other gun, and who made the statement to R.B. about "not doing something to some guy." Agents did not praise L.W. after he looked at the three photographs.

According to the report of law enforcement, L.W. noted that because he was scared, hiding behind R.B., and was only looking through the crack in the door, one of the males may have pulled the firearms (sic) out of their waistband without him seeing it.

**ANALYSIS**

An identification must be excluded if the in-court or out-of-court identification procedures violate a defendant's due process rights because they were (1) unnecessarily suggestive, and (2) unreliable. *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 2249, 53 L. Ed. 2d 140 (1977); *U.S. v. Ash*, 413 U.S. 300, 321, 93 S. Ct. 2568, 2579, 37 L. Ed. 2d 619 (1973); *Kirby v. Illinois*, 406 U.S. 682, 690–691, 92 S. Ct. 1877, 1883, 32 L. Ed. 2d 411 (1972).

The very recent United States Supreme Court opinion of *Perry v. New Hampshire*, 2012 WL 75048 (January 11, 2012), addresses this issue. "An identification infected by improper police influence . . . is not automatically excluded." *Perry* at 3. Instead, the trial judge must screen the evidence for reliability pretrial. If there is "a very substantial likelihood of irreparable misidentification," *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth. *Perry* at 3.

*Perry* emphasized that a rule requiring automatic exclusion would "g[o] too far," for it would "kee[p] evidence from the jury that is reliable and relevant," and "may result, on occasion, in the guilty going free." *Brathwaite*, 432 U.S., at 112, 97 S.Ct. 2243; see id., at 113, 97 S.Ct. 2243 (when an "identification is reliable despite an unnecessarily suggestive [police] identification procedure," automatic exclusion "is a Draconian sanction," one "that may frustrate rather than promote justice"). The Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification." *Biggers*, 409 U.S. at 201, 93 S.Ct. 375; *see Brathwaite*, 432 U.S., at 116, 97 S.Ct. 2243.

In *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), the Court adopted a test looking to "the totality of the circumstances," in which "reliability is the linchpin in determining the admissibility of identification," and the factors to be considered include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of

the suggestive identification itself." *Manson*, 432 U.S. at 113–114, 97 S. Ct. at 2252–2253.

The United States Supreme Court in *United States v. Wade*, 87 S.Ct. 1926 (1967) discussed why suggestive line up encounters which produce the substantial likelihood of misidentification must be addressed. It stated that it is a matter of common experience that, once a witness has picked out the accused he is not likely to go back on his word later. *Wade* cited commentary on proposed safeguards including requiring at least six persons in addition to the accused in a lineup of the approximate height, weight, coloration and body types as the suspect. *Wade* also suggested that the witness should be required to give a written, signed description of the suspect before viewing any arrested persons. *Id.* at 1938.

Defendant Stuker relies heavily on the case of *Oliva v. Hedgpeth*, 600 F.Supp.2d 1067, 1079-80 (C.D. Cal. 2009) to support his argument that the identification in this case was impermissibly suggestive. In *Oliva*, E.R., a six-year-old, was called as a witness to identify the shooter in a murder trial. The detective conducting the photographic identification procedure did not tell E.R. that the six photograph line-up may or may not contain a photograph of the suspect. The detectives praised E.R. immediately after she selected the defendant's photograph. Additionally, E.R. was not able to identify the suspect in

the courtroom. *Oliva v. Hedgpeth*, 375 Fed.Appx. 697, 699 (9th Cir. 2010); *Oliva v. Hedgpeth*, 600 F.Supp.2d at 1077.

The Court does not find that the identification procedure used in this case was suggestive or unnecessary. Even if it was suggestive, the Court must consider the totality of the circumstances, including the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

The only thing which could be considered suggestive about the identification of Defendants is the fact that L.W. was only shown three pictures. However, any indication of suggestion is overcome by the fact that Schillinger told L.W. that the photos may or may not be suspects and that he would be asked whether or not he recognized the person or persons. Additionally, L.W. was not praised when he identified the suspects and L.W. was not told he had to pick someone. Further, there were exigent circumstances in this case which prevented law enforcement from taking the time to get a six-person photo line-up. Law enforcement was relocating L.W.'s family to get them to a safer place and was acting quickly to avoid any unnecessary delay in an attempt to thwart additional threats and protect witnesses.

L.W.'s testimony at the suppression hearing was credible and demonstrated that the boy has a good recollection of facts. L.W. saw through the crack of the open door during the daylight. L.W. recalled that he had seen both of the Defendants previously. L.W. was scared and certainly vigilant as he watched the men talk to R.B. Although approximately three weeks had passed between the time of the alleged incident and when law enforce spoke to L.W., an incident involving several men carrying handguns approaching a family member would be something easily recalled due to the nature of the interaction.

Therefore, **IT IS HEREBY ORDERED** Defendants' Motion to Suppress is **DENIED**.

Dated this 31st day of January, 2012.

*/s/ Richard F. Cebull*_____
RICHARD F. CEBULL
U.S. DISTRICT COURT JUDGE